UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WAKEESHA N. MOODY,

                    Plaintiff,

          v.

CSX TRANSPORTATION, INC., NEW
YORK CENTRAL LINES, LLC and NYC
NEWCO, INC.,

                    Defendants.
_____

<u>DECISION & ORDER</u>

07-CV-6398P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Wakeesha N. Moody ("Moody") has sued defendants CSX

Transportation, Inc. ("CSX"), New York Central Lines, LLC, and NYC Newco, Inc.,

(collectively, "defendants") for personal injuries sustained in a railway accident. (Docket # 1-2).

On June 16, 2006, Moody attempted to crawl underneath a train car located in a railyard operated

by CSX in Lyons, New York (the "Lyons yard"). The train car began moving while Moody was

beneath it, and she was dragged approximately twenty feet, resulting in injuries including an

above-the-knee amputation of her left leg and the loss of toes on and crush injuries to her right

leg. Following the Court's entry of a Decision and Order granting in part and denying in part

defendants' motion for summary judgment (Docket # 90), the only claims that remain are for

failure to warn by sounding a horn or bell prior to moving the train car and for failure to post

appropriate warning signage in the Lyons yard.

Currently pending before this Court are three motions. (Docket ## 65, 68, 98).

First, defendants have moved to exclude testimony from Moody's expert Stephen Timko

("Timko") on the grounds that Timko's proffered opinions are not appropriate subjects for expert

testimony and do not meet the standards for admissibility established by *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579 (1993). (Docket # 65). Second, Moody has moved for spoliation

sanctions. (Docket # 68).[1] Finally, defendants have moved to bifurcate the trial and try the issue

of liability first and proceed only to the issue of damages in the event the jury determines that

defendants are liable. (Docket # 98). Oral argument on the three pending motions was held on

August 2, 2017. (Docket # 105).


## I.     Defendants' Motion to Exclude Testimony from Timko

### A.     Factual Background

Moody has disclosed Timko as an expert witness who is expected to testify at

trial. (Docket # 65-2). Timko has 49 years of experience in the railroad industry, and for the last

16 years has owned a railroad consulting service. (*Id*. at 5). His prior experience includes

serving as the Vice President and General Manager of Western New York & Pennsylvania RR,

LLC, Assistant Superintendent for Train Operations for the Norfolk Southern Railroad, and

Manager of Operations Planning for Conrail. (*Id*. at 6). According to Timko's expert report, his

opinions are based on his knowledge, experience, and training, as well as his review of the

following information: the deposition transcripts of Moody, witness Tiffany Johnson, CSX

conductor Richard Roden, CSX engineer Frederick Albrecht, CSX police officer Gary

Gawronski, and CSX police officer Alan Lee; CSX's responses to plaintiff's notices to produce

---

[1] Moody's motion was initially filed as a cross-motion to defendants' motion for summary judgment. (Docket # 68). In its Decision and Order, the Court reserved decision on this issue. (*See* Docket # 90 at 27).

and interrogatories; the Lyons Police Department accident report; the statements of Sheldon Davis, Tiffany Johnson, Joseph Monk, Richard Roden, and Frederick Albrecht; the tax map of the Lyons yard; photographs of the Lyons yard; a diagram of the Lyons yard; a video of the Lyons yard and surrounding area taken in 2008; and, his field inspection of the Lyons yard made from public property on January 17, 2015. (*Id*. at 9-10). Timko's expert report includes the following opinions: CSX failed to properly inform, educate, observe, and enforce a ban on pedestrian traffic at the Lyons yard; CSX failed to enlist the assistance of both the Lyons Police Department and the Wayne County Sheriff's Office to prevent pedestrian traffic at the Lyons yard; CSX failed to educate local political officials, media personnel, law enforcement personnel, local residents, and its own employees by sponsoring Operation Lifesaver events in Lyons;[2] CSX failed to erect fences or barricades to prohibit the movement of the public onto the rail lines and railroad property in Lyons; CSX failed to properly post the Lyons yard with signs indicating potential dangers to the public; CSX failed to acknowledge observations by their own agents and other employees that the Lyons yard was used as a "private sidewalk for local residents"; CSX failed to properly train its agents and officers in order to protect the integrity of evidence in the event of an accident, specifically locomotive video equipment, downloadable event recorder information, and audio recordings; CSX failed to properly dispatch personnel, gather and protect evidence, and document the accident scene; and, CSX failed to ensure that its operating personnel, including train and engine service crews, comply with the operating rules, safety rules, and other issued special instructions, notices, and bulletins. (*Id*. at 10-11).

As noted above, in light of the Court's decision on defendants' motion for summary judgment, the only claims that remain in this matter are for failure to warn by sounding

---

[2] Operation Lifesaver is "a nonprofit public safety education and awareness organization dedicated to reducing collisions, fatalities and injuries at highway-rail crossings and trespassing on or near railroad tracks." Operation Lifesaver, *About Us*, https://oli.org/about-us (last accessed September 20, 2017).

a horn or bell prior to moving the train car and for failure to post appropriate warning signage in the Lyons yard. (Docket # 90 at 26-27). Moody's counsel acknowledged at oral argument that Timko's opinions unrelated to these two claims are no longer relevant. Accordingly, the Court has limited its recitation of the facts to those relevant to the remaining claims.

Timko was deposed on November 17, 2015. (Docket # 65-3). Timko testified that in order to prepare his report, he spent several hours reviewing materials related to this case, including photographs, police reports, maps, and statements regarding the accident scene, and that he performed an inspection at the Lyons yard on January 17, 2015. (*Id.* at 83-87). According to Timko, his inspection of the Lyons yard occurred from public property, and he did not enter railroad property at any time. (*Id*. at 85-86).

Timko testified that CSX had a "lackadaisical attitude toward public safety" at the Lyons yard and that despite having received numerous reports of pedestrians in the yard (prompting the CSX Police Department to refer to the Lyons yard as a "public sidewalk"), CSX took no action to address the issue. (*Id*. at 106). According to Timko, when he visited the Lyons yard, he observed footprints in the snow and individuals walking through the yard, with nobody policing the station. (*Id*. at 106-07). He testified that he saw an adult man walk across the track. (*Id*. at 107-08).

Timko objected to the characterization of pedestrians in the Lyons yard as "trespassers," explaining that "you can't be a trespasser unless it's posted." (*Id*. at 126). Because there were no "No Trespassing" signs posted at the Lyons yard, Timko opined that pedestrians had no way of knowing they were not permitted to cross, and Moody was therefore not trespassing at the time of her accident. (*Id*. at 127-28). Timko later acknowledged, however, that he did not know whether there were "No Trespassing" signs posted and stated that his

opinion would be the same whether there were "some or none or lots" of such signs. (*Id.* at 130-31). Timko stated that it was necessary, in addition to posting signs, to educate people about the dangers because it is impossible to fence in the entire right-of-way. (*Id.* at 131-32). Timko further testified that CSX could have posted signs in the Lyons yard stating, "No Access," "Use Bridge," "Use Route 14 Bridge," "Private Property," "Dangerous," "High Speed Trains," or similar warnings. (*Id.* at 155-56). Timko continued that CSX could have posted a sign saying "Dangerous area, Do not enter tracks" or "any kind of signage you want to put up there." (*Id.* at 157). Timko elaborated that the warning signs "could have said something like, 'dangerous, high-speed traffic area – high speed trains'" and that CSX "needed to do some education." (*Id.* at 159). Timko also opined that, in his experience, it was standard practice in the railroad industry to put up signs posting private property. (*Id.* at 142-43).

Timko also submitted an affidavit dated April 1, 2016, in opposition to defendants' motion. (Docket # 69-5). In his affidavit, Timko alleges that the answers he gave at his deposition do not represent his full and complete opinions. (*Id.* at ¶ 2). Timko states that on June 15-16, 2006, good and accepted standards of practice required defendants to sound the train horn and bell just prior to moving the train and that defendants' failure to do so was a deviation from such good and accepted standards of practice. (*Id.* at ¶¶ 3, 5). Timko further states that CSX is a full member of the Northeast Operating Rules Advisory Committee ("NORAC") and attaches for the Court's review a copy of the NORAC operating rules that were in place on June 15-16, 2006. (*Id.* at ¶¶ 6-7, Ex. A). Timko explains that NORAC operating rules 19 and 20 required the locomotive engine bell and horn to be sounded before train movement and that defendants' internal rules imposed a similar requirement. (*Id.* at ¶¶ 9-10). Timko also opines that good and accepted standards of practice required defendants to post signs in and around the

Lyons yard stating, *e.g.*, "No Trespassing," "Private Property," and "Danger," in order "to serve as a warning to pedestrians about dangers in the Yard that they may not appreciate." (*Id.* at ¶ 16).

**B.    The Parties' Positions**

Defendants ask the Court to exclude Timko's opinions and testimony in their entirety. (Docket # 65-4 at 1-2). Defendants contend that Timko's opinions, by his own admissions, are based on "nothing more than his review of litigation documents, an internet search and observations he was able to make while seated briefly in his car parked off railroad property on a cold winter day some nine years after the incident." (Docket # 65-4 at 2). Defendants further argue that: (1) the subject matters on which Timko seeks to opine are matters that the jury can discern without the need for expert testimony; (2) Timko's opinions are based on an incomplete and/or incorrect understanding of the evidence; (3) Timko has applied no reliable methodology but has instead relied upon speculation; and, (4) none of Timko's opinions are supported by scientific or technical evidence. (*Id.* at 3).

As a threshold matter, defendants maintain that Timko's proffered opinions are not proper subjects of expert testimony. (*Id.* at 6). Defendants argue that "[t]he role of an expert is to fill specific gaps in the jury's knowledge about technical matters that are outside the ken of the average juror" and that "[a] jury is perfectly competent to determine whether warnings were given, whether a fence was erected, whether [CSX] trained its personnel, and whether [CSX] acknowledged observations about the nature of the short-cut [Moody] used." (*Id.* at 6-7). Defendants further argue that Timko's testimony would serve only to "bolster [Moody's] claim by attaching an 'expert' label to it." (*Id.* at 7).

Defendants also argue that Timko's proffered opinions do not satisfy the *Daubert* standard for admissibility. (*Id.* at 9). According to defendants, "there is no scientific theory, let alone one that has been tested with reliable certainty, that supports Timko's proposed testimony." (*Id.* at 11). Defendants further contend that Timko has offered only conclusory observations and that his opinions are not supported by "any recognized theory or methodology." (*Id.*).

With respect to Timko's opinions regarding CSX's alleged failure to warn, defendants argue that they should be excluded because (1) Timko improperly opines on legal conclusions, and (2) Timko's opinions lack an evidentiary basis and are based solely on speculation and *ipse dixit*. (Docket ## 65-4 at 13-14; 76 at 7-12).

Moody counters that Timko's testimony is admissible under *Daubert* because Timko is qualified as an expert and his testimony is reliable and will assist the trier of fact. (Docket # 70 at 5-10). Specifically, Moody argues that Timko has "specialized knowledge," gained from his extensive experience in the railroad industry, that will help inform the jury regarding the relevant industry standard for railroads. (*Id.* at 7-9). With respect to Timko's opinions regarding CSX's alleged failure to sound a bell or horn, Moody maintains that they are based upon the testimony of Moody and witness Tiffany Johnson, and that defendants' arguments regarding Timko's factual assumptions go to the weight of the testimony, not its admissibility. (*Id.* at 11). Additionally, Moody argues that testimony as to legal conclusions is not inadmissible *per se* and that Timko's opinions fall within the ambit of his training and experience. (*Id.* at 10-11). With respect to Timko's opinions regarding the failure to post signs, Moody argues that defendants have mischaracterized his testimony and that he should be

permitted to opine that accepted standards of care required defendants to post warning signs.  (*Id.* at 12-13).

**C.**     **Analysis**

Rule 702 of the Federal Rules of Evidence requires that a proposed expert witness be qualified on the basis of "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702. Accordingly, an expert may provide testimony if (1) "the testimony is based upon sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and, (3) "the expert has reliably applied the principles and methods to the facts of the case."  *Id.*  The trial court must fulfill a "gatekeeping" duty under Rule 702 to ensure that any expert testimony to be admitted is "not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).  Thus, the trial court's inquiries should focus on three issues:  "(1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact."  *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796, *1 (S.D.N.Y. 2011) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).

Under *Daubert* and *Kumho Tire*, a court must "first determine whether the proffered expert testimony is relevant."  *Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, 2008 WL 1995120, *3 (W.D.N.Y. 2008).  Further, the testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591; *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001).  The question is one of "fit," meaning that the evidence must be "sufficiently tied to

the facts of the case." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Where an expert opinion is based upon assumptions that are not present in the case, the opinion "cannot be said to 'assist the trier of fact' as Rule 702 requires." *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000). Thus, such an opinion "misleads the fact-finder and arguably does not comply with the 'fit' requirement of that Rule." *Id.*

After determining that the proffered testimony is relevant, the court must determine whether the proffered testimony "has a sufficiently 'reliable foundation' to permit it to be considered." *Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, 2008 WL 1995120 at *3 (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d at 184-85). The court has "considerable leeway" in deciding how best to make that determination. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 152. In determining reliability, the trial court must "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the [court's] belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). To assist courts in making this determination, the Supreme Court has identified the following factors to consider in determining the reliability of the methodology used by a proffered expert: "(1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique has been met with widespread acceptance." *Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988, *6 (S.D.N.Y. 2008) (citing *Daubert*, 509 U.S. at 593-94). The Rule 702 inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and while "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned[,] . . . [the] list of specific factors neither necessarily nor exclusively applies to all experts or in every case,"

*Kumho Tire Co.*, 526 U.S. at 141.  "The primary objective is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Cerbelli v. City of New York*, 2006 WL 2792755, *2 (E.D.N.Y. 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 152).  "As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'"  *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (quoting Fed. R. Evid. 702, Advisory Committee's Note).

### 1.    Failure to Warn Opinions

#### a.    Failure to Sound Bell or Horn

Timko proposes to testify that NORAC operating rules and CSX's internal regulations required that the train's bell and horn be sounded prior to train movement.  In deciding defendants' motion for summary judgment, the Court expressly considered this point and determined as a matter of law that "neither the NORAC rules nor defendants' own internal rules define defendants' duty, because those rules are more restrictive than New York's common law." (Docket # 90 at 17).  The Court further found that, under New York's common law, "defendants had a duty to sound a bell or horn, upon movement of a train, to warn trespassers of the imminent danger." (*Id*. at 21).  The Court explained that the duty arose because, as the evidence conclusively established, defendants had constructive knowledge of routine trespassers in the Lyons yard. (*Id*.).

It is the role of the Court, and not of an expert witness, to instruct the jury on the law.  In this case, the Court has already determined as a matter of law that defendants had a duty to sound a bell or horn prior to train movement, and the jury will be instructed accordingly.  As a

result, Timko's proposed testimony on this point simply states a legal conclusion on which the jury will be instructed, and it is thus inadmissible. *See*, *e.g.*, *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000) ("[i]n evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony [that] states a legal conclusion") (internal quotation omitted); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, LLC, 691 F. Supp. 2d 448, 476 (S.D.N.Y. 2010) (expert testimony regarding parties' legal obligations "improperly usurps the role of the trial judge in instructing the jury as to the applicable law and the role of the jury in applying the law to the facts before it").

      **b.**      **<u>Failure to Post Warning Signs</u>**

Timko has also offered testimony regarding defendants' alleged failure to post warning signs in the Lyons yard. Specifically, Timko has opined that good and accepted standards of practice required defendants to post signs in and around the Lyons yard stating, *e.g.*, "No Trespassing," "Private Property," and "Danger," "High Speed Trains," or other signage necessary to educate the public.

Defendants argue that Timko's opinions regarding signage are not based on accepted scientific methodology. (Docket # 65-4 at 13-14). It is well-established, however, that "expert testimony does not [have to] rest on traditional scientific methods." *United States v. Litvak*, 808 F.3d 160, 180 n.25 (2d Cir. 2015) (internal quotation omitted). "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" *Kumho Tire Co.*, 526 U.S. at 148-49 (quoting Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40, 54 (1901)). The Second Circuit has cautioned that "district courts must be mindful that the *Daubert* factors do not all necessarily apply even in every instance in which

reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert." *United States v. Litvak*, 808 F.3d at 180 n.25 (internal quotation omitted).

Here, it is undisputed that Timko has nearly 50 years' experience in the railroad industry. He testified at his deposition that, in his experience, it was standard practice in the railroad industry to post warning signs. This is a proper expert opinion. *See Corneli v. Adventure Racing Co., LLC*, 2015 WL 4716285, *8 (N.D.N.Y. 2015) (proposed expert with long career in amusement and entertainment safety industry could properly opine on "usage, placement, and verbiage of warning signs" at go-kart track). The average juror is unlikely to have any knowledge regarding standard practice in the railroad industry regarding the posting of warning signs and would be aided by Timko's testimony on this issue. *See Scott v. City of New York*, 591 F. Supp. 2d 554, 563 (S.D.N.Y. 2008) (expert with lengthy career in policing could testify about police industry practices, as such testimony was likely to aid the jury).

Defendants have argued that Timko's testimony regarding the failure to post warning signs should be excluded because it is based on faulty factual assumptions – namely, that Timko does not actually know what signs were posted in the Lyons yard at the time of Moody's accident. "Arguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony." *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *7; *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d at 266 (lack of "textual support" for expert's opinion in published studies or scientific literature may affect weight and not admissibility). Defendants may cross-examine Timko on the factual assumptions underlying his opinions about their failure to post warning signs, but they have not established that the opinions should be excluded.

At oral argument, defendants' counsel advanced the additional argument that, based on the Court's summary judgment decision, Timko's opinions are not relevant because they do address the issue whether warning signs would have informed Moody that trains in the Lyons yard moved at nighttime without warning. Timko's expert report identifies the following as one of his expert opinions: "CSX failed to properly post the Lyons, NY area with signs indicating potential dangers or hazards to the public prior to the June 2006 injury to Ms. Moody." (Docket # 65-2 at 10). At his deposition, Timko stated that the warning signs in the Lyons yard could have included "any kind of signage" and that it was incumbent on CSX to educate the public about the dangers of moving trains. (Docket # 65-3 at 157-59). Timko reiterated in his affidavit that good and accepted standards of practice required defendants to post signs in the Lyons yard "to serve as a warning to pedestrians about dangers in the Yard that they may not appreciate." (Docket # 69-5 at ¶ 16). In my estimation, these opinions are relevant to the claims remaining in this case and will be helpful to the jury in ascertaining whether the presence of warning signs in the Lyons yard would have contributed to Moody's appreciation of the danger that trains move without warning at nighttime.

## 2.     <u>Other Opinions</u>

In his expert report and/or in his deposition testimony, Timko opined that CSX failed to sponsor Operation Lifesaver events or work with local police to educate the public, failed to properly respond to reports of pedestrian traffic at the Lyons yard, failed to properly train its employees regarding the collection and preservation of evidence, failed to perform proper airbrake testing, failed to erect a fence or barricade, and failed to properly inspect the railcars (collectively, the "non-failure to warn opinions"). (Docket ## 65-2 at 10-11; 65-3 at 148-49, 180). Timko also opined at his deposition that Moody did not appreciate the dangers

inherent in climbing under a railcar. (Docket # 65-3 at 138-39). At oral argument, Moody's counsel conceded that, because the only two remaining claims in this matter relate to defendants' alleged failure to sound the horn or bell prior to train movement and failure to post warning signs, Timko's opinions are relevant only as they relate to those two specific issues. Accordingly, the Court grants defendants' motion to preclude the non-failure to warn opinions. *See In re Refco Inc. Sec. Litig.*, 2012 WL 7007795, *4 (S.D.N.Y. 2012) ("[t]o the extent the experts here are opining about the merits of dismissed claims, they fail the *Daubert* 'fit' requirement for the simple reason that those merits have already been determined and are no longer relevant to the proceedings") (collecting cases), *report and recommendation adopted*, 2013 WL 452400 (S.D.N.Y. 2013).

Defendants have also met their burden of showing that Timko is unqualified to opine as to plaintiff's particular appreciation of the dangers of climbing beneath a railcar. Timko does not purport to have any training or expertise in the fields of psychology or sociology, nor does the record suggest that he is qualified to assess Moody's particular ability to appreciate danger. "[A]n expert must . . . stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d at 672 (internal quotation omitted) (finding railroad expert unqualified to opine on minimum time required for individual to clear path of train because he was not an expert in "human factors analysis").

In sum, defendants' motion to exclude is denied with respect to Timko's proposed testimony on defendants' alleged failure to post warning signs and is granted in all other respects.

## II.    **Moody's Motion for Sanctions**

### A.    **Factual Background**

The train that injured Moody was designated Q627 and operated by engineer Frederick Albrecht.  (Docket # 68-6 at 44).  The locomotive attached to Train Q627 was equipped with an event recorder, also known as a "black box," which records all movements from the locomotive, including acceleration, deceleration, speed, air pressure, braking, and use of the bell and/or horn.  (*Id*. at 9-11).  The event recorder operates continuously.  (*Id*. at 12).

Michael Lewandowski ("Lewandowski"), CSX's road foreman of engines, was deposed on February 28, 2011, and testified that he had received approximately two months of on-the-job training regarding retrieval of information from an event recorder.  (*Id*. at 13). Lewandowski further testified that he attended "a handful" of eight-hour classes on the same subject.  (*Id*. at 14-15).

In 2006, Lewandowski was responsible for downloading information from event recorders.  (*Id*. at 16).  He described the process as consisting of (1) entering the locomotive; (2) measuring the wheel to determine speed; (3) ringing the bell and blowing the horn and matching the time on his cell phone to the time on the locomotive; and, (4) turning on the computer and entering the data, finding "the program," plugging in cables, and "click[ing] on the program," which would then "automatically download[] to the computer."  (*Id*. at 17). Lewandowski testified that he would use a laptop owned and provided by CSX to download information from an event recorder and that this laptop was not available for anyone else's use. (*Id*. at 22-23).  The downloaded information from a locomotive such as the one attached to Train Q627 would consist of three files, a .STA file, a .SIS file, and a .DAT file, all of which are necessary in order to read the data.  (*Id*. at 50-52).

In June 2006, Lewandowski was responsible for accessing the event recorder on the train that had injured Moody. (*Id*. at 43-45). Lewandowski had no specific memory of having downloaded the information from Train Q627, but testified that it was his practice to open the data files and confirm that the necessary data was present. (*Id*. at 52). Defendants have submitted a declaration from Stephen Swanson ("Swanson"), a senior software engineer for CSX, the exhibit to which shows that Lewandowski downloaded the data from Train Q627 at 2:30 a.m. on June 16, 2006, shortly after the accident occurred. (Docket # 81-2, Ex. A).

After retrieving data from an event recorder, Lewandowski was required by CSX's procedures to transmit it to a central data vault (the "Vault") in Jacksonville, Florida, using a communications program known as ERAD. (Docket # 68-6 at 29-30). He would select the individual data files from the downloads folder on his laptop's hard drive and transmit them to the Vault via ERAD. (*Id*.).

As discussed further below, defendants have been unable to produce the .DAT file from the event recorder on Train Q627. Lewandowski testified that he did not remember if he had uploaded the .DAT file to the Vault and that it was possible he sent only two files. (*Id*. at 52-53). CSX's records show that Lewandowski uploaded three files, but that he uploaded a .HDR file instead of a .DAT file. (Docket # 81-2, Ex. A). A .HDR file is generated by event recorders on a different kind of locomotive than the one involved in the instant matter. (*Id*. at ¶ 11). Defendants surmise that Lewandowski inadvertently selected the .HDR file rather than the correct .DAT file as the third file in his upload. (Docket # 81 at 5).

At some point between Moody's accident in June 2006 and 2010, the laptop Lewandowski used to download the files from Train Q627's event recorder crashed. (Docket # 68-6 at 54). Lewandowski estimated that the crash occurred "within a year or two" of

Moody's accident. (*Id*. at 54-55). Lewandowski sent the crashed laptop to Jacksonville. (*Id*. at 57-58). Defendants are unable to provide information regarding what efforts, if any, were made to recover data from the crashed laptop, nor have they been able to produce the laptop. (*See* Docket # 81 at 5).

Moody served discovery demands on June 23, 2009, in which she requested, among other items, the "[c]omplete event recorder printout(s) for [Train Q627]." (*See* Docket ## 22 at 1; 68-3 at 15). In their response dated April 9, 2010, defendants stated that they had "identified a download for the subject locomotive" but "[t]he data . . . is not in readable format" and that they were "seeking outside expert assistance in attempting to retrieve the data from the download." (Docket # 68-3 at 15). On April 14, 2010, Moody served a supplemental notice to produce "specifically requesting the 'download' and information/software necessary to interpret the data." (*See* Docket # 22 at 1). On June 22, 2010, defendants responded to Moody's supplemental notice by enclosing a copy of the 'download' and reiterating that they had been unable to "discern the format or obtain any readable information." (Docket # 68-4 at 1-2). Defendants' counsel also sent a letter dated June 22, 2010, in which he stated that Lewandowski had downloaded the data from the event recorder and:

> It appears Mr. Lewandowski downloaded two of three files necessary to read the information, apparently failing to upload a "dat" file. Upon discovery of the missing "dat" file, inquiry was made of Mr. Lewandowski to kindly check his laptops to determine if the missing file was available. Unfortunately, by the time this request was made, Mr. Lewandowski's laptop had crashed and [been] turned into CSX Communications for recycling and/or destruction.

(Docket # 68-5 at 1).

**B.** **The Parties' Positions**

Moody seeks sanctions on the grounds that defendants have spoliated evidence. (Docket # 68-1 at 11). Specifically, Moody maintains that defendants spoliated the data from the event recorder and requests that the Court strike defendants' answer or, in the alternative, provide an adverse inference instruction. (*Id.*).

According to Moody, defendants had a duty to preserve the event recorder data saved on Lewandowski's laptop and in the Vault. (Docket # 68-1 at 14). Moody argues that defendants were aware that the event recorder data was "central" to the parties' dispute and that the laptop at issue was "the only tangible piece of evidence that held this critical data," and thus they had a duty to preserve the evidence. (*Id.* at 15). Moody further contends that defendants failed to take reasonable steps to preserve the data on the laptop and/or in the Vault and their actions were willful or grossly negligent. (*Id.* at 16-17). Finally, Moody argues that she has been prejudiced by the destruction of the data because it would have conclusively resolved the central issue of whether the locomotive's horn or bell sounded prior to train movement. (*Id.* at 19-20). Accordingly, she maintains that severe sanctions are warranted. (*Id.* at 20).

Defendants dispute that sanctions are warranted, maintaining that they took reasonable steps to preserve the event recorder data, Moody was not prejudiced by the loss of the data, and defendants did not act culpably. (*See* Docket # 81 at 9). Defendants characterize their actions (sending Lewandowski to retrieve the event recorder data within hours of the accident and promptly sending it to a central system) as objectively reasonable and urge the Court to find that only "inadvertent human error" caused the loss of the data. (*Id.* at 10). Defendants further contest that they had any obligation to preserve Lewandowski's laptop, emphasizing that the law does not require parties to maintain multiple copies of relevant evidence. (*Id.* at 11).

Defendants argue that Moody has not been prejudiced by the loss of the event recorder data because (1) failure to sound the bell or horn would not amount to negligence (*id.* at 13), and (2) Moody may still present her claim to the jury without the event recorder data, and the jury will be "perfectly capable of determining who is telling the truth" about whether or not the horn or bell was sounded (*id.* at 14-15). Defendants contend that there is no way of knowing whether the event recorder data would have supported Moody's version of events, and "[i]t is at least as likely that the event recorder data would have corroborated the engineer's (Mr. Albrecht's) testimony that he *did* sound the horn." (*Id.* at 15) (emphasis in original).

Finally, defendants maintain that, even if the Court were to determine that some sanction is appropriate, severe sanctions are precluded because they did not intentionally deprive Moody of the event recorder data. (*Id.* at 16). Defendants contend that simple human error amounts "at most to simple negligence" and does not constitute bad faith or intentional destruction of evidence. (*Id.* at 17).

In reply, Moody argues that the data at issue was lost not because of isolated human error, but due to multiple and "monumental" failures on the part of defendants to ensure that the data remained accessible, from which the Court may infer that defendants intentionally deprived her of the event recorder data. (Docket # 83 at 5-6, 10-11). Moody further maintains that she was indeed prejudiced by the loss because the data would have conclusively determined whether the horn was sounded. (*Id.* at 6-7). In the alternative, Moody asks the Court to impose "other curative sanctions." (*Id.* at 11-12).[3]

---

[3] With the Court's permission, defendants filed a sur-reply in which they argue that they should not be penalized for failing to check that Lewandowski had uploaded the correct data to the Vault and reiterate that they did not act culpably. (Docket # 85-1 at 3-5).

C.	**Analysis**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'"  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010) (internal quotation omitted), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1724 (2013).

Generally, a party bringing a spoliation motion must demonstrate that:  (1) the party charged with destroying the evidence had an obligation to preserve it; (2) the records were destroyed with a "culpable state of mind"; and, (3) the destroyed evidence was relevant to the party's claim or defense.  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-08 (2d Cir. 2001)); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).  This general rule applied to the destruction of both tangible and electronic evidence until December 1, 2015, at which time Rule 37 of the Federal Rules of Civil Procedure was amended to provide a different standard for destruction of electronically stored information.  Specifically, Rule 37(e) now provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). This new rule "rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." *McIntosh v. United States*, 2016 WL 1274585, *31 (S.D.N.Y. 2016) (internal quotation omitted).

Rule 37(e) was amended as part of the 2015 amendments to the Federal Rules of Civil Procedure, and the new version "govern[s] in all proceedings in civil cases commenced after December 1, 2015, and, insofar as just and practicable, all proceedings pending on that date." *Id.* (internal quotations omitted). "Courts within this Circuit have applied the amended version of Rule 37(e) on a case-by-case basis." *Distefano v. Law Offices of Barbara H. Katsos, PC*, 2017 WL 1968278, *4 (E.D.N.Y. 2017). With some exceptions, motions that were filed and briefed prior to December 1, 2015, have been decided under the prior standard, and those briefed thereafter have been decided under the amended version. *See id.* (collecting cases).

Here, the Court finds that it is both just and practicable to apply the current version of Rule 37(e) to Moody's motion. The motion was filed on April 1, 2016, four months after the 2015 amendments took effect. Moreover, both parties' briefs acknowledge and argue the current version of Rule 37(e). Additionally, "[t]he new rule places no greater substantive

obligation on the party preserving ESI" and "is in some respects more lenient as to the sanctions that can be imposed for violation of the preservation obligation," and therefore "there is no inequity in applying it." *CAT3, LLC v. Black Lineage, Inc*., 164 F. Supp. 3d 488, 496 (S.D.N.Y. 2016).

Moody argues that the current version of Rule 37(e), which deals only with the loss of electronically stored information, does not apply to defendants' destruction of Lewandowski's "crashed" laptop because it is tangible evidence. (*See* Docket # 83 at 3-6). I disagree. Although the laptop itself is tangible evidence, the electronic information stored within the laptop is the relevant evidence. Had defendants lost or destroyed the contents of the laptop but preserved the physical hardware, Moody would be in precisely the same position as she is now. It is the loss of the electronic evidence stored on the laptop that gives rise to this dispute – one that falls squarely within the scope of Rule 37(e), the terms of which apply whenever "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e).

Accordingly, this Court will apply the current version of Rule 37(e). Under that rule, the Court must consider (1) whether electronic information that should have been preserved has been lost; (2) whether defendants took "reasonable steps" to preserve that information; (3) whether the information can be restored or replaced through additional discovery; (4) whether Moody has been prejudiced by the loss of the information; and, (5) whether defendants acted with the intent to deprive Moody of the information's use. *See generally CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d at 495-502.

### 1.     Duty to Preserve

"Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 216 (emphasis in original). A party is obligated to preserve evidence when it has "notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001); *Creative Res. Grp. of New Jersey, Inc. v. Creative Res. Grp., Inc.*, 212 F.R.D. 94, 105 (E.D.N.Y. 2002). Here, defendants do not contest that they had an obligation to preserve the event recorder data, nor could they plausibly do so. No genuine question exists that the event recorder data from the locomotive involved in the accident that injured the plaintiff likely contains relevant information. Nor is there any dispute that the data has been lost. Accordingly, the Court finds that the first element of Rule 37(e) has been met.

### 2.     Reasonable Steps to Preserve

Moody, as the party seeking sanctions, must show that defendants failed to take reasonable steps to preserve the event recorder data. Moody maintains that defendants' failure at any time between 2006 and 2010 to confirm that the files uploaded to the Vault by Lewandowski were complete and accessible was unreasonable. Moody further contends that destruction of the crashed laptop was unreasonable.

As a threshold matter, I find that defendants' explanation for the loss of the data strains credulity. According to defendants, although Lewandowski uploaded certain event recorder data to the Vault within hours of Moody's accident, no one attempted to access or review the data at any time during the next four years, despite the fact that defendants had been

sued by the injured party and the data – had it been uploaded correctly – would have established relevant and material facts, such as: (1) whether the bell and/or horn were sounded prior to train movement; (2) how fast the train was moving when Moody was struck; and, (3) whether the brakes had been applied. The proposition that a sophisticated railroad transportation corporation such as CSX could be involved in a serious accident in which an individual lost a limb and thereafter fail for four years to review critical data relating to how that accident occurred is unfathomable. The implausible nature of defendants' narrative is heightened by their complete inability to explain what happened to Lewandowski's laptop after he returned it to Jacksonville. Of course, a court is not required to credit explanations for the loss of the relevant evidence that it finds incredible. *See, e.g.*, *Babaev v. Grossman*, 2008 WL 4185703, *3 (E.D.N.Y. 2008) (imposing sanctions for spoliation where "the court d[id] not find the defendants' arguments credible, nor their evidence persuasive, on the fundamental issue of whether they engaged in spoliation of the evidence on the . . . computer").

        Even if defendants' explanation for the loss of the data were credited, their failure to access the files uploaded to the Vault for the four-year period before 2010 conflicted with their duties under the Federal Rules of Civil Procedure. The instant lawsuit was commenced in July 2007 and removed to federal court in August of that year. (*See* Docket # 1). Moody's complaint expressly asserts that the train that injured her "began moving without issuing a siren, signal or any warning whatsoever." (Docket # 1-3 at ¶ 17). In their answer, filed on August 22, 2007, defendants denied that allegation "for lack of knowledge or information sufficient to form a belief as to [its] truth." (Docket # 2 at ¶ 17). Pursuant to Rule 11 of the Federal Rules of Civil Procedure, a party or attorney who signs a pleading "certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the*

*circumstances*[,] . . . the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or lack of information." Fed. R. Civ. P. 11(b)(4) (emphasis added). Accepting defendants' recitation of events, they submitted an answer – which they allowed to stand without supplementation – denying for lack of knowledge that the involved train moved without sounding the bell and/or horn without checking data, in their sole control and possession, that they knew would have conclusively shown whether that was accurate. Although Moody has not sought Rule 11 sanctions and this Court is not determining that issue, defendants' apparent failure to conduct the inquiry required by Rule 11 is relevant to this Court's assessment of defendants' conduct.[4] Significantly, had defendants reviewed the event recorder data prior to submission of their answer (or promptly thereafter in order to supplement it), they would have discovered that the .DAT file was missing no later than August 2007. According to Lewandowski's testimony, the file likely still existed on his laptop at that time and could have been recovered. (Docket # 68-6 at 54-55).

Defendants also failed to comply with their obligation under Rule 26 to provide "without awaiting a discovery request . . . a copy – or a description by category and location – of all documents, *electronically stored information*, and tangible things that [they had] in [their] possession, custody, or control and may use to support [their] claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis added). Initial disclosures must be "based on the information then reasonably available to [the party]." Fed. R. Civ. P. 26(a)(1)(E). Moreover, discovery responses must be based on a "reasonable inquiry." *Markey v. Lapolla Indus., Inc.*, 2015 WL 5027522,

---

[4] At oral argument, their counsel suggested that defendants should not be deemed responsible for their prior counsel's failure to perform a reasonable inquiry prior to submission of the answer. It is well-established, however, that represented parties may be subject to Rule 11 sanctions where they share responsibility for the violation. *See*, *e.g.*, *Braun ex rel. Advanced Battery Techs., Inc. v. Zhiguo Fu*, 2015 WL 4389893, *12 (S.D.N.Y. 2015) ("[u]nder Rule 11(c)(1), sanctions may be imposed not only against attorneys, but also against represented parties, where the party is responsible for the violation") (internal quotation omitted). Here, the fact that Lewandowski took steps to retrieve the event recorder data within hours of the accident evidences that defendants were aware of the importance of that information.

*15, 19 (E.D.N.Y. 2015) (sanctioning law firm for failing "to conduct a more thorough investigation of the discovery in [p]laintiffs' possession prior to serving the [i]nitial [d]isclosures"), *report and recommendation adopted*, 2016 WL 324968 (E.D.N.Y. 2016). Pursuant to this Court's scheduling order, the Rule 26 mandatory disclosures were required to be made by no later than July 15, 2008. (Docket # 6). Again, even accepting defendants' representations about what they did and what they knew about the data, they nonetheless submitted their initial disclosures without apparently reviewing the event recorder data, despite the fact that Moody's complaint undeniably put them on notice that whether or not the bell and/or horn were sounded prior to the train's movement was a key factual dispute. Considering all the circumstances, this Court finds that defendants' failure to perform this straightforward and required inquiry was unreasonable, at best. *Cf. Tippett v. Burlington N. Santa Fe Corp.*, 2009 WL 10665811, *2 (D.N.M. 2009) (noting train event recorder was provided with initial disclosures), *aff'd in part, vacated in part sub nom. Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74 (10th Cir. 2011); *BNSF Ry. Co. v. LaFarge Sw., Inc.*, 2008 WL 9471222, *1 (D.N.M. 2008) (same).

Moreover, [a] party's failure to maintain electronic data in an accessible format may constitute sanctionable conduct. *See, e.g.*, *Mazzei v. Money Store*, 308 F.R.D. 92, 101 (S.D.N.Y. 2015) (failure to maintain invoice system in accessible format warranted sanctions), *aff'd*, 829 F.3d 260 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1332 (2017); *Arrowhead Capital Fin., Ltd. v. Seven Arts Entm't, Inc*, 2016 WL 4991623, *20 (S.D.N.Y. 2016) (delay in downloading discoverable information from server or moving it from server to new cloud-based system was reckless and unreasonable when party knew it might lose access to server), *reconsideration granted in part on unrelated grounds*, 2017 WL 1653568 (S.D.N.Y. 2017). Courts routinely

hold that a party's discovery obligations include taking "affirmative steps" to "ensure that all potentially relevant evidence is retained." *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 289 (S.D.N.Y. 2009) (internal quotation omitted) (finding spoliation where party failed to maintain original version of electronic spreadsheet, but instead transferred files from hard drive to compact discs). Here, defendants themselves admit that they took no steps to confirm that the event recorder data had been properly uploaded by Lewandowski. Indeed, according to Swanson's declaration, any attempt to access the information in the Vault would have revealed the uploading error. (*See* Docket # 81-1 at ¶ 12). In other words, defendants allowed the original data on the event recorder to be overwritten and destroyed without ensuring that it had been appropriately preserved. Just as it would be unreasonable for a party preserving a paper file to copy it blindly, put it in a drawer without ever looking at it, and then destroy the original, so too was it unreasonable for defendants to upload the event recorder data to the Vault and not even look at the files to confirm that the appropriate data had been uploaded and was accessible. This failure is especially remarkable in view of the important and irreplaceable nature of the data at issue.

Referring to the copy of the event recorder data stored in the Vault as a "backup," defendants assert they had no obligation to "double-check" a backup. (*See*, *e.g.*, Docket # 85-1 at 3). To the contrary, Lewandowski's testimony makes clear that the copy in the Vault was the primary copy. (*See* Docket # 68-6 at 48-49). Specifically, he testified that any request for event recorder data would "go through Jacksonville" and he played no role in the process of disseminating event recorder data. (*Id.*). Indeed, elsewhere in their papers defendants state that they "reasonably believed that [the] primary copy of the data had been properly stored in the Jacksonville data vault." (Docket # 81 at 11). Defendants' argument that the Vault constituted a

"data backup system" and that they had no obligation to "double-check [the] backup" (*see* Docket # 85-1 at 3) is specious and does not change the Court's conclusion that it was unreasonable for defendants to fail to confirm that the uploading procedure had been properly completed.

The Court further finds that defendants acted unreasonably in destroying or recycling Lewandowski's crashed laptop. Lewandowski testified that it had crashed within a year or two after the accident and that he sent it to Jacksonville. (Docket # 68-6 at 54-55, 57-58). Defendants have been unable to locate any data that was retrieved from the crashed laptop or to provide any information regarding whether and, if so, what efforts were undertaken to retrieve such data.

Although it was decided under the prior version of Rule 37(e), the court's decision in *Learning Care Grp., Inc. v. Armetta*, 315 F.R.D. 433, 437 (D. Conn. 2016), is instructive. There, the plaintiff had a policy of backing up employee emails to a server, rather than saving them locally on a specific computer. *Id*. at 436. After litigation had been commenced, the plaintiff destroyed, in the normal course of business and consistent with its normal practices, a laptop computer used by its former chief marketing officer ("CMO"), who was a key player in the activity underlying the lawsuit. *Id*. Numerous emails sent by the former CMO were later discovered to have been deleted from the server. *Id*. The defendants moved for sanctions on the grounds that the plaintiff had spoliated evidence by destroying the laptop from which "they would likely have been able to recover many of the deleted e-mails." *Id*. at 436-37. The court agreed that the plaintiff had an obligation to preserve the laptop and that its conduct in destroying it was negligent. *Id.* at 437-40.

As in *Learning Care*, defendants destroyed or recycled Lewandowski's laptop despite knowing that it likely contained relevant evidence that they never confirmed had been properly uploaded to another repository (the Vault). For all the reasons discussed herein, I find that defendants did not take reasonable steps to preserve the event recorder data.

### 3. <u>Reproducibility of Lost Information</u>

The third element the Court must consider is whether the lost information can be restored or replaced by other means. Nothing in the record before the Court suggests that the event recorder data may be restored or replaced, and defendants have not argued otherwise. Accordingly, the Court concludes that this element of Rule 37(e) has been met.

### 4. <u>Prejudice to Moody</u>

Under Rule 37(e)(1), sanctions may be imposed where the loss of electronic information has prejudiced the moving party. Here, defendants dispute that Moody has been prejudiced, arguing that Moody has other evidence available to her regarding whether the bell and/or horn were sounded and that the event recorder data might not have supported Moody's claims.

"In order to impose a sanction under Rule 37(e)(1), the court must have some evidence regarding the particular nature of the missing ESI in order to evaluate the prejudice it is being requested to mitigate." *Eshelman v. Puma Biotechnology, Inc*., 2017 WL 2483800, *5 (E.D.N.C. 2017). The Advisory Committee notes explain:

> The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of

> all parties.  Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations.  The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Prejudice under Rule 37(e) may be found where a party has been required to "piece together information from other sources to try to recover relevant documents."  *In re: Ethicon*, *Inc.*, 2016 WL 5869448, *4 (S.D. W. Va. 2016).

Under the circumstances of this case, the Court finds that it would be unreasonable and unfair to require Moody to demonstrate that the event recorder data would have been favorable to her.  Indeed, the Second Circuit has cautioned district courts against "holding the prejudiced party to too strict a standard of proof regarding the likely contents of . . . destroyed evidence."  *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998).  At least one court has held that "[t]o show prejudice resulting from the spoliation [under the current version of Rule 37(e)], a party must only come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been."  *TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo*, 2017 WL 1155743, *1 (D.P.R. 2017) (internal quotations omitted) (finding prejudice where party "plausibly suggest[ed]" that a discarded laptop "might have" contained documents or information relevant to the action).

Here, as defendants' counsel acknowledged at oral argument, the event recorder data would have conclusively determined whether the horn or bell on Train Q627 were sounded prior to movement.  That critical and irreplaceable data was within defendants' complete control to review and produce, but they failed to take simple, reasonable steps to preserve it.  Moody has identified testimonial evidence (her own and that of her friend Tiffany Johnson) that the bell and/or horn were not sounded prior to train movement.  Under these circumstances, it is

plausible that the data from the event recorder would have supported Moody's case. Accordingly, prejudice has been established.

In addition, the loss of the data has required Moody to spend additional resources to attempt to resolve this critical factual dispute. Moody likely would not have deposed Lewandowski had the event recorder data been available, and the Court could have determined as a matter of law whether or not defendants had complied with their duty to sound the bell and/or horn prior to train movement. The Court therefore concludes that defendants' loss of this information has prejudiced Moody. *See*, *e.g*, *Aktas v. JMC Dev. Co*., 877 F. Supp. 2d 1, 18 (N.D.N.Y. 2012) (party's inability to inspect original evidence resulted in "significant prejudice"), *aff'd*, 563 F. App'x 79 (2d Cir. 2014); *Henkel Corp. v. Polyglass USA, Inc*., 194 F.R.D. 454, 457 (E.D.N.Y. 2000) (defendant's inability to inspect original evidence that plaintiff inspected resulted in uneven "evidentiary playing field"; "[b]ecause plaintiff is responsible for this evidentiary disparity, some form of sanction is appropriate").

## 5. <u>Intentional Deprivation</u>

Having determined that some sanction is appropriate in this case, the Court must decide whether the specific sanctions sought by Moody – striking defendants' answers and/or issuing an adverse inference instruction – are warranted. "Rule 37(e)[(2)][5] now reserves the harshest discovery sanctions, such as adverse inference instructions, dismissals, or default judgments, only for cases in which the court can 'fin[d] that the [spoliating] party acted with the intent to deprive another party of the information's use in the litigation.'" *Jenkins v. Woody*,

---

[5] Rule 37(e)(2) "does not include a requirement that the court find prejudice to the party deprived of the information." Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment. As discussed below, the Court finds that defendants acted with an intent to deprive Moody of the event recorder data, and Rule 37(e)(2) thus applies. Accordingly, sanctions are warranted even in the absence of a finding of prejudice.

2017 WL 362475, *17 (E.D. Va. 2017) (quoting Fed. R. Civ. P. 37(e)(2)).  This intent standard is "stringent" and "does not parallel other discovery standards."  *Id.*

Moody argues that the Court may infer an intent to deprive from defendants' actions in this matter.  (*See* Docket # 68-1 at 22).  The Court agrees.  In *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 2017 WL 930597 (N.D. Ala. 2017), the court held that a party may be found to have acted with an intent to deprive within the meaning of Rule 37(e)(2) where "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator."  *Id.* at *15 (quoting *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1323 (S.D. Fla. 2010)).  Defendants' conduct in this case supports such an inference.  As explained more fully *supra*, no question exists that the lost evidence was highly relevant – if not the most important objective evidence – to the determination of liability.  While knowing they had a duty to preserve the event recorder data, defendants allowed the original data on the event recorder to be overwritten, and destroyed or recycled Lewandowski's laptop without ever confirming that the data had been preserved in another repository.  Finally, their failure to make any effort over the course of four years to confirm that the data was properly preserved in the Vault undercuts the reasonableness and credibility of their asserted belief that the material was still accessible.  On this record, the Court finds that defendants acted with the intent to deprive Moody of the use of the event recorder data.  *See id.* at *16 ("this . . . unexplained, blatantly irresponsible behavior leads the court to conclude that [defendant] acted with the intent to deprive [plaintiff] of the use

of this information"). *See also Brown Jordan Int'l, Inc. v. Carmicle*, 2016 WL 815827, *1, 33-37 (S.D. Fla. 2016) (finding intent to deprive where spoliating party did not credibly explain failure to preserve), *aff'd*, 846 F.3d 1167 (11th Cir. 2017); *Internmatch, Inc. v. Nxtbigthing, LLC*, 2016 WL 491483, *1, 4 n.6, 11 (N.D. Cal. 2016) (finding defendants had acted with intent to deprive where "the alleged chronology of events [was] highly improbable, [and] [d]efendants' story [was] filled with inconsistencies."

        Moreover, even accepting as credible defendants' explanation for the loss of the event recorder data, this Court still concludes that defendants' actions presented sufficient circumstantial evidence from which to infer that they intended to deprive Moody of the relevant data. *See Ottoson v. SMBC Leasing & Fin., Inc.*, 2017 WL 2992726, *9 (S.D.N.Y. 2017) (intentional failure to take steps necessary to preserve relevant evidence "satisfies the requisite level of intent required by Federal Rule of Civil Procedure 37(e)"). Here, even if Lewandowski's initial error in uploading the event recorder data to the Vault is excused, defendants' repeated failure over a period of years to confirm that the data had been properly preserved despite its ongoing and affirmative Rule 11 and Rule 26 obligations, particularly before discarding Lewandowski's laptop, is so stunningly derelict as to evince intentionality. *See, e.g.*, *Henkel Corp. v. Polyglass USA, Inc.*, 194 F.R.D. at 457 (plaintiff's conduct in disregard of its discovery obligations, while suggesting but not conclusively establishing bad faith, demonstrated that it was "highly culpable for the destruction of the relevant evidence") (citing *Shaffer v. RWP Grp., Inc.*, 169 F.R.D. 19, 26 (E.D.N.Y. 1996) (finding party "highly culpable" for its "conscious and reckless disregard" of discovery obligations)). Thus, because I find that defendants' acted with intent to deprive, Rule 37(e)(2) permits the imposition of severe sanctions.

Contrary to Moody's position, this Court does not find that an order striking defendants' answer is justified. "[C]ourts must be wary of issuing case-dispositive sanctions; such sanctions should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 141 (S.D.N.Y. 2009) (internal quotation omitted). Here, although defendants' actions were sufficiently egregious to support a finding of intent, they were not so outrageous as to warrant outright disposition of the case. Rather, in my estimation, an adverse inference instruction is justified. "The prophylactic and punitive rationales [for an adverse inference instruction] are based on the . . . commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly place the risk of an erroneous judgment on the party that wrongfully created the risk." *Kronisch v. United States*, 150 F.3d at 126 (internal quotation omitted). Here, an adverse instruction appropriately addresses the evidentiary gap caused by defendants' loss of such material evidence. The precise form of the instruction will be decided by the Court at the time of trial.

III.  **Defendants' Motion to Bifurcate the Trial**

A.  **Factual Background**

As a result of the accident, Moody suffered extensive injuries, including the "traumatic amputation of her left leg, as well as severe and extensive damage to and disfigurement of her right leg, including the loss of the great toe on her right foot." (Docket # 98-2 at 3). According to defendants, Moody intends to call at least three damages experts at trial, in addition to the physicians who treated her injuries. (Docket # 98-1 at ¶¶ 11-13). Defendants state that they will likely introduce testimony of other medical and economics

experts in order to defend against Moody's claimed damages and, other than testimony from Moody herself, there is unlikely to be an overlap between liability witnesses and damages witnesses. (*Id*. at ¶¶ 14-15).

### B. The Parties' Positions

Defendants request that the Court bifurcate the trial into a liability phase and a damages phase. (Docket # 98-3 at 1). Defendants contend that bifurcation will simplify the issues and likely expedite the proceedings because the jury is likely to find in their favor on the issue of liability. (*Id*. at 2-4). Defendants further argue that there is a risk of juror confusion absent bifurcation. (*Id*. at 4-6). Finally, defendants advance the novel argument that bifurcation is mandated by the Due Process Clause. (*Id*. at 6-8).

Moody contends that the risk of undue prejudice is low and speculation about juror sympathy is insufficient to warrant bifurcation. (Docket # 103-1 at 5-6). Moody further contends that "any potential for prejudice may be avoided through appropriate jury instructions." (*Id*. at 8). She points out that her physical injuries are obvious, and bifurcation will not prevent the jury from feeling sympathy for her. (*Id*.). If anything, bifurcation could prejudice her because the jury may reasonably infer, and be influenced by the assumption, that their term of jury service will be shortened by a liability verdict in favor of defendants. (*Id*. at 11).

Moody further opposes defendants' motion on the basis that the issues of liability and damages are intertwined. (*Id*. at 12-13). According to Moody, because her theory of the case presupposes that she would have had time to escape from beneath the train had defendants sounded the horn or bell prior to movement, "the biomechanics of her injuries, and the nature in which they were sustained, are critical to liability." (*Id*. at 13).

C.    <u>**Analysis**</u>

"Decisions to bifurcate trials . . . are authorized by Federal Rule of Civil Procedure 42(b) and are typically well within the discretion of district courts." *In re Sept. 11 Litig.*, 802 F.3d 314, 339 (2d Cir. 2015).  Under Rule 42(b), bifurcation may be ordered "[f]or convenience, to avoid prejudice, or to expedite and economize."  Fed. R. Civ. P. 42(b); *see also Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996) ("[t]he interests served by bifurcated trials are convenience, negation of prejudice, and judicial efficiency").  Bifurcation is "the exception, not the rule, and the movant must justify bifurcation on the basis of the substantial benefits that it can be expected to produce." *Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d 283, 284 (D. Conn. 2004); *see also Kos Pharm., Inc. v. Barr Labs., Inc.*, 218 F.R.D. 387, 391 (S.D.N.Y. 2003) ("[t]he inconveniences, inefficiencies and harms inherent in these probable consequences [of bifurcation] – to the parties and third parties, to the courts, and to the prompt administration of justice – weigh against separation of trials and suggest that, for those probable adverse effects to be overcome, the circumstances justifying bifurcation should be particularly compelling and prevail only in exceptional cases").  In considering whether to bifurcate, "the [c]ourt should examine, among other factors, whether bifurcation is needed to avoid or minimize prejudice, whether it will produce economies in the trial of the matter, and whether bifurcation will lessen or eliminate the likelihood of juror confusion." *Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d at 284.  For the reasons set forth below, the Court finds that bifurcation is not appropriate.

1.    <u>**Minimization of Prejudice**</u>

Defendants argue that they will be prejudiced if the trial is not bifurcated because evidence of Moody's damages will "dilute[] the proof on liability" and will also "create[] the risk

that a jury will return a liability verdict that is tainted by the damages evidence and the sympathy Ms. Moody's injuries are likely to invoke." (Docket # 98-3 at 5-6). These concerns do not warrant bifurcation. While Moody's injuries may evoke some sympathy in the jurors, "the same observation could be made in any case involving traumatic injuries or death. Yet, the issues of liability and damages are routinely tried [together], even in cases of death or severe injury." *Svege*, 329 F. Supp. 2d at 284; *see also Chase v. Near*, 2007 WL 2903823, *2 (W.D.N.Y. 2007) (denying bifurcation motion where "there are no particular factors specific to this case that distinguish the potential for prejudice here from the potential prejudice which is normally and customarily dealt with through an appropriate charge and curative instructions where necessary") (internal quotation omitted). Moody's injuries, while serious, do not raise an unusual risk of juror sympathy. In any event, regardless of whether the Court bifurcates the issues of liability and damages, the jurors will inevitably learn in the liability phase that Moody was seriously injured. "Therefore, it is not clear to this [c]ourt that bifurcation will eliminate or even substantially reduce the potential prejudice that [d]efendants fear." *Svege*, 329 F. Supp. 2d at 285 (finding bifurcation inappropriate where jurors would inevitably learn during liability phase that father had died and two children had been injured in accident). Moreover, "[a]ny danger of prejudice c[an] be minimized through appropriate jury instructions." *Ake v. Gen. Motors Corp.*, 942 F. Supp. 869, 877 (W.D.N.Y. 1996) (collecting cases); *see also Coyle v. Crown Enters., Inc.*, 2009 WL 2399904, *1 (W.D.N.Y. 2009) ("concern that the presentation of substantial evidence regarding [p]laintiffs' injuries could somehow prejudice and confuse the jury can be obviated through a curative jury instruction").

## 2. Promotion of Judicial Economy

Defendants also argue that "there is a substantial likelihood that bifurcation here will avoid the need for damages testimony altogether" and that "[t]he probability of a defense verdict on liability is especially high in this case." (Docket # 98-3 at 3). "Defendants' argument that they are likely to succeed at the liability stage, thereby eliminating the need for a second trial, is not persuasive. This argument could be made in every case." *Mensler v. Wal-Mart Transp., LLC*, 2015 WL 7573236, *4 (S.D.N.Y. 2015); *see also Svege*, 329 F. Supp. 2d at 285 ("[t]he [c]ourt certainly appreciates [d]efendants' confidence on the eve of trial[;] [h]owever, without expressing any view on the ultimate outcome of this trial, it suffices to say that [d]efendants' projected savings are by no means guaranteed") (internal quotation omitted). Although the Court noted that the summary judgment determination in this case was close, "[t]he [c]ourt cannot predict who will be successful at the liability stage, and therefore this argument does not justify bifurcation." *Mensler v. Wal-Mart Transp., LLC*, 2015 WL 7573236, at *4. Considering that this case has been pending for nearly a decade, the potential, but far-from-certain, benefit to judicial economy created by a bifurcated trial does not justify the delay, however modest it may be, in a final resolution of the case. In addition, a decision to bifurcate may create unnecessary disputes about the admissibility of particular evidence during the liability phase – the argument and resolution of which may prolong the jury's ultimate determination.

## 3. Prevention of Juror Confusion

Defendants contend that there is no genuine risk of evidentiary overlap between the issues of liability and damages. I disagree. As Moody correctly points out, one of the key disputes as to liability is whether defendants' alleged failure to sound the locomotive's bell

and/or horn proximately caused Moody's injuries. Moody therefore intends to offer evidence that she would have been able to escape from underneath the train without injury if the bell and/or horn had sounded. This proof will likely encompass evidence concerning how Moody's injuries occurred, including which parts of the train impacted which parts of her body. In addition, Moody and Tiffany Johnson will both testify on the issues of liability and damages. Under these circumstances, bifurcation is not warranted. *See*, *e.g.*, *Ake v. Gen. Motors Corp.*, 942 F. Supp. at 877 (bifurcation not warranted where "[s]ome evidence, such as that relating to the fire, would be relevant to both liability (to show the cause of death) and damages for conscious pain and suffering"); *Mensler*, 2015 WL 7573236, at *4 ("[t]he evidence in this matter regarding liability and damages, while separate and potentially severable, overlaps[;] [f]or example, [two witnesses] will testify to both liability and damages"); *Chase v. Near*, 2007 WL 2903823, at *2 (bifurcation is inappropriate where "there will necessarily be some overlap of witnesses and their testimony").

Moreover, "this case does not present complex legal or factual questions" (*Mensler*, 2015 WL 7573236, at *4), and no reason exists to doubt a jury's inability to separate the issues of liability and damages. *See also Svege*, 329 F. Supp. 2d at 283 ("this case is not so complicated and the liability issues are not so numerous or complex that the jury is likely to be distracted from their task on liability by the presence of testimony and exhibits relating to damages[;] . . . [g]ood lawyering and careful instructions should keep the jury focused and on task even if liability and damages are tried together").

### 4. <u>Due Process Considerations</u>

Relying solely on the Supreme Court's decision in *Connecticut v. Doehr*, 501 U.S. 1 (1991), defendants advance the novel argument that the Due Process Clause compels

bifurcation in this case. In *Doehr*, the Supreme Court held that a Connecticut statute "authoriz[ing] prejudgment attachment of real estate without prior notice or hearing, without a showing of extraordinary circumstances, and without a requirement that the person seeking the attachment post a bond" violated the Due Process Clause. *Id.* at 4. Defendants have not cited a single case applying *Doehr* in the context of a request for bifurcation of a personal injury case. This Court discerns no constitutional impediment under the Due Process Clause to trying together the issues of liability and damages.

In *Doehr*, the Supreme Court articulated a three-factor test for evaluating the procedures that a state must provide before depriving an individual of his property: "first, consideration of the private interest that will be affected by the . . . measure; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, . . . principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." *Id.* at 11. In other words, defendants' argument rests on the premise that a non-bifurcated trial of this relatively straightforward personal injury case presents such a substantial risk of an erroneous outcome that it would be constitutionally foreclosed. The Due Process Clause does not compel such a result, particularly considering that courts across the country conduct non-bifurcated personal injury trials every day, and no evidence has been presented to conclude that the jury determinations of those matters are infected by impermissible considerations of sympathy.

In sum, I conclude that defendants have not shown that either the Due Process Clause or Fed. R. Civ. P. Rule 42(b) requires bifurcation of the trial in this matter.

## <u>CONCLUSION</u>

For the reasons discussed above, defendants' motion to exclude Timko's testimony **(Docket # 65)** is **GRANTED in PART and DENIED in PART**.  Moody's motion for sanctions **(Docket # 68)** is **GRANTED**.  Defendants' motion to bifurcate the trial **(Docket # 98)** is **DENIED**.

**IT IS SO ORDERED.**

                                               *s/Marian W. Payson*

                                              MARIAN W. PAYSON
                                     United States Magistrate Judge

Dated:  Rochester, New York
          September 21, 2017